IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

SANGELITA WEEKOTY, as Personal
Representative of the Estate of FREDDIE
WEEKOTY, as Personal Representative of
the Estate of Jeanette Weekoty and as
Guardian and Next Friend of LEANDRA
WEEKOTY,

      Plaintiffs,

vs.                                                                                   No. CIV 97-0935 LH/DJS

UNITED STATES OF AMERICA,

      Defendant.

**MEMORANDUM OPINION AND ORDER**

**THIS MATTER** comes before the Court on Defendant's Objection to Magistrate Judge's Order Entered July 22, 1998 (Docket No. 35), filed July 31, 1998. The Court, having considered the pleadings submitted by the parties, and otherwise being fully advised, finds that the objection should be **sustained** and the Magistrate should be **reversed**.

### INTRODUCTION

Under Rule 72(a) of the Federal Rules of Civil Procedure the Court "shall consider objections made by the parties . . . and shall modify or set aside any portion of the magistrate's order found to be clearly erroneous or contrary to law." "The clearly erroneous standard is intended to give the magistrate a free hand in managing discovery issues." R. Marcus & E. Sherman, COMPLEX

LITIGATION at 643 (1985). In this regard, the reviewing court must affirm the magistrate unless, after reviewing all of the evidence, it "is left with the definite and firm conviction that a mistake has been committed." *Ocelot Oil Corp. v. Sparrow Indus.*, 847 F.2d 1458, 1464 (10th Cir. 1988) (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395 (1948)). When reviewing a question of law, however, the standard is *de novo*. *See* 14 JAMES WM. MOORE ET AL., MOORE'S FEDERAL PRACTICE § 74App.09 (3rd ed. 1998) (stating that the "standard of review remains constant regardless of whether the appeal is to the district court or to the court of appeals") (footnotes omitted); 19 MOORE'S FEDERAL PRACTICE § 206.04[1] (noting that a lower court's "conclusions on questions of the application, interpretation and construction of law in civil and criminal cases are reviewed *de novo* on appeal"). This Court, therefore, owes no deference to the magistrate's legal conclusions and it may substitute its own judgment on questions of law. *Id.*

In its objection, the United States asserts that Magistrate Judge Svet improperly granted a motion to compel seeking documents related to a morbidity and mortality review convened after Mr. Weekoty died while in the care of Dr. Julie Magri, a United States Health Service physician. The Government contends that this review was convened solely for the purpose of peer review deliberations and that it should, therefore, not be compelled to produce either the report prepared after that review or the minutes of that review. Magistrate Svet granted the Plaintiff's motion to compel, finding that there is no federally recognized self-critical analysis privilege, that the Defendant failed to show that the deliberative process privilege applied in this case, and that the Defendant failed to show that the information requested is immune from discovery pursuant to state statute. *See* N.M. STAT. ANN. § 41-9-5 (Repl. Pamp. 1996). Defendant filed a motion for

reconsideration before the Magistrate and the instant objection. The Magistrate has denied the motion for reconsideration. (*See* Magistrate's Order (Docket No. 40), filed August 20, 1998.)

The United States specifically objects to the Magistrate's finding that the affidavit of Dr. Kessler, Clinical Director of the Zuni IHS Clinic, "[did] not satisfy the requisites for application of [the state statutory] peer review immunity." (*See* Def.'s Objection at 2 (quoting Judge Svet's Order filed July 22, 1998, at 3).) Specifically the Magistrate found that the Defendant failed to show the requested information "was generated exclusively for peer review and for no other reason, and that the opinions were formed exclusively as a result of peer review deliberations." (*See Id.* (citing *Southwest Community Health Servs. v. Smith*, 107 N.M. 196, 755 P.2d 40 (1998).) Despite Plaintiff's allegation to the contrary, the Court finds that the United States also challenges the Magistrate's conclusion that there is no federally recognized self-critical analysis privilege. (*See* Def.'s Objection at ¶¶ 1-3.)

### THE SELF-CRITICAL ANALYSIS PRIVILEGE

The Court will first consider the Magistrate's conclusion that there is no federally recognized self-critical analysis privilege. In his Order, the Magistrate supports his rejection of the self-critical analysis privilege by referencing *Beyer v. Douglas*, No. Civ. 95-307 BB/DJS (Mem. Op. & Order, April 5, 1996) and citing *Spencer Savings Bank v. Excell Mortgage Corp.*, 960 F.Supp. 835, 843-44 (D.N.J. 1997). However, in *Beyer*, Judge Black concluded that the party objecting to the magistrate's order lacked standing to raise the self-critical analysis privilege and only then noted, in *dicta*, that "the existence and parameters of this privilege are at best uncertain." (*See Beyer*, No. Civ. 95-307 BB/DJS, slip op. at 5.) In the *Beyer* opinion Judge Black reviewed, Magistrate Svet recognized that the privilege was created to protect physician peer review materials and is "based

upon the policy consideration of encouraging entities to engage in honest self-evaluation in order to ensure compliance with the law or professional standards." (*See Beyer v. Douglas*, No. Civ. 95-307 BB/DJS, slip op. at 9-10 (Amended Order, February 14, 1996).) Rather than rejecting the existence of the privilege, Magistrate Svet properly concluded that the self-critical analysis privilege did not apply to a report prepared in anticipation of litigation. Finally, while a magistrate judge in the District of New Jersey roundly rejected the privilege in *Spencer*, he did so in the context of a discovery dispute over a report by the Plaintiff Bank's loan review committee, not in light of the life saving discussions conducted during a morbidity and morality conference. 960 F.Supp. 835. Moreover, another magistrate judge in that district recognized the privilege only one year earlier. *See Harding v. Dana Transport, Inc.*, 914 F.Supp. 1084, 1100 (D.N.J. 1996) (recognizing existence of self-critical analysis privilege but finding it not applicable to protect investigative materials from discovery). These authorities lend only limited support to the conclusion that the self-critical analysis privilege should not protect the records of a morbidity and mortality conference.

It is true, as both Judges Black and Svet noted, that some courts have observed that the nature and scope of the self-critical analysis privilege is undefined. *See e.g. Dowling v. American Hawaii Cruises, Inc.*, 971 F.2d 423, 425 n. 1 (9th Cir. 1992). However, this privilege has been repeatedly recognized in the context of morbidity and mortality conferences conducted by physicians. *See e.g. Bredice v. Doctors Hospital, Inc.*, 50 F.R.D. 249 (D.D.C. 1970), *aff'd without opin.*, 479 F.2d 920 (D.C. Cir. 1973) (seminal federal case recognizing the self-critical or self-evaluative privilege in the context of a hospital peer review conference on the care and treatment of patients); *Balk v. Dunlap*, 163 F.R.D. 360, 363 (D. Kan. 1995) (finding minutes of OB/GYN meeting called to discuss the quality of patient care protected under Kansas medical peer review statutes)*; Brem v. Decarlo, Lyon,*

*Hearn & Pazoureck, P.A.,* 162 F.R.D. 94, 98-99 (D. Md. 1995) (magistrate, in federal question case, recognizing application of Maryland state statutory medical peer review privilege and noting privilege in other jurisdictions); *Spinks v. Children's Hospital National Medical Center*, 124 F.R.D. 9, 12 (D.D.C. 1989) (denying motion to compel production of morbidity and mortality conference and finding such materials subject to District of Columbia's statutory privilege); *Utterback v. Yoon*, 121 F.R.D. 297 (W.D. Ky. 1987) (finding Board of Investigation memorandum and Veterans Administration quality assurance records confidential and free from discovery in Federal Tort Claims Act medical malpractice claim against the United States); *Gillman v. United States*, 53 F.R.D. 316, 318-19 (S.D.N.Y. 1971) (citing *Bredice*, 51 F.R.D. 187, and holding Plaintiff not entitled to reports of a hospital's Board of Inquiry investigating suicide).

Nonetheless, the privilege has generally been rejected in other contexts. *See e.g. University of Pennsylvania v. EEOC*, 493 U.S. 182 (1990) (rejecting peer review privilege in academic tenure context and finding no basis for such a privilege in either the First Amendment or the concept of academic freedom); *Spencer*, 960 F.Supp. at 840-44 (D.N.J. 1997) (rejecting the self-evaluative privilege in the mortgage loan context and citing cases rejecting privilege in other contexts); *Harding*, 914 F.Supp. at 1100 (recognizing existence of self-critical analysis privilege but finding it not applicable to protect investigative materials from discovery). Although of questionable necessity in many applications, the self-critical analysis privilege is particularly pertinent in the medical context as it promotes frank and honest discussions which protect lives and improve patient care. *See generally,* Charles David Creech, Comment, *The Medical Review Committee Privilege: A Jurisdictional Survey*, 67 N.C. L. REV. 179 (1988). Because of this unique role in preserving the

public health, medical morbidity and mortality reviews must be distinguished from other peer review cases.

Rule 501 of the Federal Rules of Evidence permits this Court to recognize privileges under "the principals of the common law as they may be interpreted by the courts of the United States in light of reason and experience." The Supreme Court has cautioned that evidentiary privileges should not be recognized or applied unless it "promotes sufficiently important interests to outweigh the need for probative evidence." *Jaffee v. Redmond*, 518 U.S. 1 (1996) (citing *Trammel v. United States*, 445 U.S. 40, 51 (1980)). This provides federal courts "with the flexibility to develop rules of privilege on a case-by-case basis." *Trammel*, 445 U.S. at 47 (citation omitted).

As Dr. Kessler notes in his original affidavit, the peer review at question here is not a part of a patient's medical treatment, rather it is "intended as a frank and candid discussion in which . . . physicians evaluate the quality and appropriateness of the techniques and procedures used in a patient's care and any recommended changes in these techniques or procedures." (*See* Def. Opp. Pl. Mot. Compel (Docket No. 27), Ex. A ¶ 4.) The Court agrees with Dr. Kessler that if these review sessions were open to discovery and public rebuke, physicians would not be as frank or candid and the goal of improving medical care would be substantially undermined. (*See Id.* ¶ 7.) It is precisely for this reason that the privilege was first recognized in the federal courts:

> As doctors have a responsibility for life and death decisions, the most up-to-date information and techniques must be available to them. There is an overwhelming public interest in having [morbidity and mortality review meetings] held on a confidential basis so that the flow of ideas and advice can continue unimpeded . . . . These . . . meetings being retrospective with the purpose of self-improvement, are entitled to a qualified privilege on the basis of this overwhelming public interest.

*Bredice*, 50 F.R.D. at 251. To open these meetings to public scrutiny would completely undermine the public good produced by ensuring confidentiality. "Constructive professional criticism cannot occur in an atmosphere of apprehension that one doctor's suggestion will be used as a denunciation of a colleague's conduct in a malpractice suit." *Id*. at 250.

### THE *JAFFEE V. REDMOND* EXAMPLE

Recognition of this privilege in the medical setting is supported by the same policy considerations and Rule 501 analysis as the United States Supreme Court relied upon in *Jaffee v. Redmond*, when it recognized the psychotherapist-patient privilege. 518 U.S. at 15. In *Jaffee*, the Supreme Court observed that the psychotherapist-patient privilege, like the attorney-client and spousal privileges, is "rooted in the imperative need for confidence and trust" which promotes frank and complete disclosures. *Id.* at 10. Similarly, applying the self-critical analysis privilege in this case will ensure the same level of confidence and trust which will promote the type of frank and open discussions necessary to accurately analyze medical procedures and decisions so that errors may be corrected and patient care can be improved. *See Id*. at 6. Just as the Court recognized in *Jaffee*, "the mere possibility of disclosure" would undermine this necessarily open and unconstrained self examination. *See Id*. at 10. Moreover, the public interest served by protecting medical peer review conferences from disclosure is perhaps greater than that served by the individual based spousal, attorney-client, and psychotherapist-patient privileges. A single conference in this context promotes knowledge and understanding among numerous physicians about life saving techniques and potentially life threatening decisions. (*See* Def.'s Opp. Pl.'s Mot. Compel, Ex. A ¶¶ 4-7.) Thus, the public good is multiplied far beyond an individual patient's care, as the information promotes more effective patient care throughout a hospital.

This privilege is further supported by the *Jaffee* analysis. The Supreme Court "recognized that it is appropriate to treat a consistent body of policy determinations by state legislatures as reflecting both [the] 'reason' and 'experience'" Rule 501 requires in the recognition of a new privilege. *Jaffee*, 518 U.S. at 13; *Thompson Co. v. General Nutrition Corp*, 671 F.2d 100, 103 (3rd Cir. 1982) (holding that a federal court may "resort to state law analogies for the development of a federal common law of privileges in instances where the federal rule is unsettled"). The *Jaffee* Court concluded that federal recognition of the psychotherapist privilege under Rule 501 was "confirmed by the fact that all 50 states and the District of Columbia have enacted into law some form of the psychotherapist privilege." 518 U.S. at 13. In this instance, "at least forty-six states [and the District of Columbia] now have statutes that protect the work of medical review committees . . . from discovery or introduction as evidence at trial." Creech, 67 N.C. L. REV. at 179-80 (citing *Sanderson v. Frank S. Bryan, M.D., Ltd.*, 361 Pa. Super. 491, 495 n.3, 522 A.2d 1138, 1140 n. 3 (Pa. Super. Ct. 1987) (listing state statues and statues that recognize a medical review privilege); IIA HOSPITAL LAW MANUAL (Medical Books) 78-106 (1986) (listing state statues dealing with discovery and admissibility of medical records, and giving a summary of each)); D.C. CODE ANN. § 32-505 (1981). Thus, as in *Jaffee*, the nearly unanimous state legislative recognition of the self-critical analysis privilege in the medical peer review context confirms the appropriateness of recognizing the privilege in this forum. *See* 518 U.S. at 13.

Recognizing the self-critical analysis privilege in this case is also supported by New Mexico's own statutory privilege. *See Memorial Hosp. for McHenry County v. Shadur*, 664 F.2d 1058, 1061 (7th Cir. 1981) (comity compels recognition of state privileges when there is no

substantial cost to federal policies). New Mexico, like the vast majority of the other states,[1] has recognized a self-critical analysis privilege in the medical context and has protected such discussions from discovery. *See* N.M. Stat. Ann. § 41-9-5 (precluding any party from using the confidential records of medical peer review proceedings in civil litigation). Moreover, out of comity, it is incumbent upon this Court to consider the New Mexico legislature's conclusion that the public interest in confidential morbidity and mortality conferences outweighs the interest of a single party to discovery of those discussions. *See Lora v. Bd. Educ. of the City of New York*, 74 F.R.D. 565, 576 (E.D.N.Y. 1977) (holding "[i]f a state holds out the expectation of protection to its citizens, they should not be disappointed by a mechanical and unnecessary application of the federal rule"); *United States v. King*, 73 F.R.D. 103, 105 (E.D.N.Y. 1976) (recognizing "a strong policy of comity between state and federal sovereigns impels federal courts to recognize state privileges where this can be accomplished at no substantial cost to federal substantive and procedural policy").

It is true that unlike the psychotherapist privilege recognized in *Jaffee*, the self-critical privilege was not included in the Advisory Committee's proposed privilege rules. *See United States v. Gillock*, 445 U.S. 360, 367-368 (1980) (rejecting state legislative privilege, in part, because no

---

[1] *See e.g.* CONN. GEN. STAT. ANN. § 19a-17b (a)(4)(d) (West 1997) (stating "[t]he proceedings of a medical review committee conducting a peer review shall not be subject to discovery or introduction into evidence in any civil action"); DEL. CODE ANN. § 1768 (1992) (protecting records of peer medical review committees from discovery); D.C. CODE ANN. § 32-505 (providing medical review committee records a qualified privilege from discovery); FLA. STAT. CH. 766.101(5) & 395.0191(8) (1993) (stating that "the investigations, proceedings, and records of the [medical review committee] shall not be subject to discovery or introduction into evidence"); GA. CODE ANN. § 31-7-143 (1998) ("the proceedings and records of medical review committees shall not be subject to discovery or introduction into evidence in any civil action"); ILL. COMP. STAT. ANN. § 5/8-2101 (West 1992) (stating records of medical committees intended to reduce morbidity and mortality are privileged); MD. HEALTH OCC. CODE. ANN § 14-501 (1991 &1994 Supp.) (providing that records of medical review committees are not discoverable); TENN CODE. ANN. § 63-6-219 (1997) (recognizing confidentiality essential to function of medical peer review committees and to improvement of health care and protecting the records of such committees from discovery); TEX. HEALTH & SAFETY CODE ANN. § 161.032(a) (West 1997) (stating that the records and proceedings of a medical committee are confidential and are not subject to court subpoena). For a complete list of medical peer review privilege statutes *see* Creech, 67 N.C. L. REV. 179 and sources cited therein.

such privilege included in the Advisory Committee's draft"). However, as the Fifth Circuit observed, Congress has recognized the importance of confidentiality in the peer review context. *United States v. Harris Methodist Fort Worth*, 970 F.2d 94, 101 (5th Cir. 1992) (citing 42 U.S.C. § 11101(5) (Congressional finding of overriding national need for confidentiality for physicians engaging in effective professional peer review); 42 U.S.C. § 1395 and § 291m (promotion of medical self-governance by admonishing that regulations should not "supervise or control" medical practice or hospital operations)); *see also* 38 U.S.C. § 3305 (stating that records and documents of Veterans Administration medical qualify assurance programs are confidential and privileged and setting out exceptions). The Court must conclude that these congressional actions combined with the above noted judicial and legislative recognition of this privilege, overcome any impediment caused by the Advisory Committee's decision to not list this privilege in its draft. *See Trammel*, 445 U.S. at 47 (noting that Rule 501 did not freeze the law governing privileges but directed the federal courts to "continue the evolutionary development" of privilege law).

## CONCLUSION

Given the "overwhelming public interest" in providing physicians with a confidential context in which to evaluate the effectiveness of life-saving techniques and procedures, the Court is compelled to recognize the self-critical analysis privilege in the context of morbidity and mortality conferences and will apply it in this case.[2] *See Harris Methodist*, 970 F.2d at 101 (recognizing "an

---

[2] The Court recognizes that the affidavit of Dr. Kessler is somewhat limited in its discussion of the purpose of the morbidity and mortality reviews and the implications of its public disclosure. (*See* Def.'s Opp. Pl.'s Mot. Compel, Ex. A.) However, the Court concludes that the statements contained in paragraphs 4-7 of the affidavit are sufficient to allow the Court to use its reason and experience to recognize the impact public disclosure would have on such reviews and on patient care at the Zuni IHS Clinic. *See Jaffee*, 518 U.S. at 6 (nothing that "reason tells us that psychotherapists and patients share a unique relationship in which the ability to communicate freely without fear of public disclosure is the key to successful treatment") (quoting the Court of Appeals below in *Jaffee v. Redmond*, 51 F.3d 1346, 1355-56 (7th Cir. 1995)).

overwhelming public interest in promoting improvement in health care through the mechanism of physician peer review") (citations omitted). Clearly the public good—saving lives and correcting life threatening errors by physicians resulting from preserving the confidentiality of morbidity and mortality conferences—outweighs the general preference for open discovery. *See Elkins v. United States*, 364 U.S. 206, 234 (1960); *see also In re Grand Jury Proceedings of John Doe v. United States*, 842 F.2d 244, 246-49 (10th Cir. 1988). The Plaintiff does not appear to dispute the Defendant's assertion that in seeking this information, she merely seeks to confirm evidence and opinions already discovered. (*See* Def.'s Objection ¶ 3). The information sought is not direct evidence of the alleged tortious acts, but is a discussion intended to help the medical staff improve patient care and avoid errors in medical treatment. This effort to reform past practices makes morbidity and mortality conferences analogous to a subsequent remedial measure which would usually be excluded from evidence. *See* FED. R. EVID. 407. Thus, the loss of the opportunity to discover this material will have a minimal impact on the Plaintiff.

Because the Court agrees with the judgement of the United States Congress, the vast majority of state legislatures, and the New Mexico Legislature, that the self-critical analysis privilege in the medical peer review context will serve "public good transcending the normally predominate principle of utilizing all rational means for ascertaining truth," *Trammel*, 445 U.S. at 50, the Court must recognize the application of the privilege in this context. *See Jaffee*, 518 U.S. at 15. Having concluded that the Magistrate misapprehended the application of the self-critical analysis privilege, the Court finds that the Magistrate's Order was contrary to law and should be reversed. The material sought by the Plaintiff's Motion to Compel is protected by the self-critical analysis privilege, perhaps more properly called the medical peer review privilege, and is not subject to discovery nor

introduction at trial. Given this conclusion, it is unnecessary for the Court to consider the Magistrate's rejection of the separate application of the state statutory privilege contained in section 41-9-5 of the New Mexico Statutes Annotated.

**IT IS, THEREFORE, ORDERED** that Defendant's Objection to Magistrate Judge's Order Entered July 22, 1998 (Docket No. 35), filed July 31, 1998, is **sustained** and the judgment of the magistrate is **reversed**.

_____
**UNITED STATES DISTRICT JUDGE**